**NOT SCHEDULED FOR ORAL ARGUMENT**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

| | |
|---|---|
| IOWA ENVIRONMENTAL COUNCIL, et al.,<br><br>*Petitioners*,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>*Respondents*. | Case No. 26-3374 |

**RESPONDENTS' NOTICE OF THE ARMY'S INTENT TO RESPOND TO IMMEDIATE THREAT UNDER RCRA'S EMERGENCY EXCLUSION**

The Government notifies the Court that the Department of the Army ("Army") intends to invoke the emergency munitions and explosives exclusion to EPA's regulatory and permitting Resource Conservation and Recovery Act ("RCRA") requirements, under which the Army may perform treatment by controlled detonation of the lead azide waste without the Emergency Permit that is challenged in this petition. *See* 40 C.F.R. §§ 264.1(g)(8)(i)(D), 270.1(c)(3)(i)(D). There is an immediate risk that the lead azide at the Iowa Army Ammunition Plant (the "Facility") will explode as temperatures are expected to drop below 30 degrees Fahrenheit in the next several days. The Army must perform a controlled detonation

to protect the public from the more significant threat from an uncontrolled explosion, and the Army intends to act by November 24, 2026. A controlled detonation allows the Army to implement measures to minimize the risk to the public, including the risk from the ejection of partial unexploded ordnances that can explode later from the Facility. The Army intends to act consistent with the terms of the Emergency Permit and its mitigation measures even if not in effect. That includes mitigation measures to minimize the risk of the dispersal of lead dust. In short, a controlled detonation is by far safer than an uncontrolled explosion.

The emergency exception does not depend on the Emergency Permit and is therefore not affected by, nor contradictory to, the terms of this Court's administrative stay. But out of an abundance of caution, the Army provides this notice to explain, for the Court's benefit, the immediate threat of an imminent explosion of lead azide at the Facility.

## I. The Army does not need a permit under EPA's RCRA regulations to conduct a controlled detonation of the lead azide at the Facility in this emergency situation.

There is an immediate risk that the lead azide at the Facility will spontaneously explode. *See* Declaration of Col Aaron Teller. The waste has deteriorated to a degree that it is extremely sensitive to friction from crystal formation. *Id.* ¶ 9. The barrels holding the waste cannot be removed due to the risk of explosion, which prevents the Army from taking other measures to reduce that

risk. *Id.* ¶¶ 12-13. As the outside temperatures drop the risk of an uncontrolled explosion increases because the formed crystals can break more easily in freezing temperatures. *Id.* ¶ 13. If the crystals break, this could cause a chain reaction detonation that could cause an uncontrolled dispersal of lead azide into the environment. *Id.* ¶ 15. Temperatures have already dropped below 30 degrees Fahrenheit, with temperature swings as low as 24 degrees and high as 70 degrees. *Id.* ¶¶ 28-29. These recent temperature swings have dramatically increased the risk of an uncontrolled explosion and threat to public safety. *Id.* ¶ 29. Further, the bunkers, where the barrels are located, are now more vulnerable to temperature changes because the blast doors were removed in preparation of the controlled detonation and cannot be replaced. *Id.* ¶ 27.

Under these circumstances, EPA's RCRA regulations provide an exemption from both substantive and permitting requirements to allow immediate action. The RCRA regulations provide that the substantive standards "do not apply to":

> a person engaged in treatment or containment activities during immediate response to . . . [a]n immediate threat to human health, public safety, property, or the environment, from the known or suspected presence of military munitions, other explosive material, or an explosive device, as determined by an explosive or munitions emergency response specialist as defined in 40 C.F.R. § 260.10.

40 C.F.R. § 264.1(g)(8)(i)(D). The same exclusion from permitting requirements is at 40 C.F.R. § 270.1(c)(3)(i)(D).

Here, an explosive or munitions emergency specialist has made the requisite determination. Teller Decl. ¶ 3. Thus, EPA's RCRA regulations allow the Army to conduct a controlled detonation of the lead azide at the Facility even if the Emergency Permit that is at issue in this case is not in effect. As will be addressed further in the Government's response to Petitioners' stay motion that the Government will file tomorrow, a controlled detonation is the safest way to prevent an uncontrolled explosion of the lead azide. *See* Teller Declaration ¶¶ 18-25. Any other options require handling the lead azide in a way that poses an unacceptable risk of an uncontrolled explosion. *Id.* ¶¶ 6-17.

A controlled detonation minimizes the risk associated with the resulting explosion. *Id.* ¶¶ 16-25. During a controlled detonation, the Army can implement a full suite of mitigation efforts including, providing advance public notice; performing the detonation under favorable weather conditions (e.g., less wind, light rain) to mitigate the spread of lead dust; wetting to reduce lead dust dispersal; treating the lead to prevent only a partial detonation; facilitating any necessary community evacuation; and monitoring to identify where any lead dust may spread and where any environmental response actions may be needed. *Id.* ¶¶ 18-25. Indeed, in preparation for the controlled detonation, the Army has already constructed protective barriers around the munitions bunkers to minimize the escape of blast material. *Id.* ¶ 21.

A spontaneous explosion, on the other hand, is much riskier. In an uncontrolled explosion, the Army cannot implement its robust mitigation efforts. Failing to treat all the lead azide, for example, could result in a random dispersal of explosive material. *Id.* ¶ 17. This partially exploded lead azide could explode later —a second spontaneous explosion—creating extremely unsafe conditions for the public and for personnel conducting post-detonation cleanup. *Id.* Unfavorable winds could increase the dispersion of lead dust in the community. *Id.* ¶ 25. And without public notice, the public may panic upon the spontaneous explosion. A controlled detonation is unquestionably much more protective to the public than an uncontrolled explosion.

A controlled detonation is necessary now to respond to the immediate threat of an uncontrolled explosion of military munitions at the Facility. EPA's regulations allow the Army's planned action without the need for a permit and the Army intends to act on November 24, 2026.

## II. The administrative stay does not bar the Army's emergency response.

A stay and an injunction do different things. A stay "operates upon the judicial proceeding itself" by "temporarily divesting an order of enforceability," while an injunction "is directed at someone, and governs that party's conduct." *Nken v. Holder*, 556 U.S. 418, 428–29 (2009). The Court's order stays EPA's Emergency Permit. It suspends the authority the Permit conferred, but it does not enjoin or

otherwise prohibit the Army from acting under a separate legal authority that does not depend on the Emergency Permit. Because 40 C.F.R. § 264.1(g)(8)(i) and § 270.1(c)(3) of EPA's regulations allow the Army's planned action without a permit, the stay does not reach it.

RCRA's emergency exclusion controls here. An uncontrolled detonation of nearly five tons of primary explosive would endanger soldiers, contractors, and the surrounding communities, all without many of the protective measures meant to minimize the risks from the blast—harm that cannot be undone. Teller Decl. ¶¶ 16-17. The environmental and health interests Petitioners seek to protect plainly are better served by a controlled detonation than by an uncontrolled explosion, which would not allow for wetting the blast material, control the timing to align with favorable weather conditions, and prior public notification, and could scatter partially destroyed lead azide. *Id.* ¶¶ 14–15, 17–21. The real choice, in other words, is not between a detonation and no detonation. It is between a planned and mitigated detonation and an unplanned and unmitigated explosion. To protect its personnel and the surrounding communities, the Army needs to take swift action. Protection of human health and the environment demand action now, not delay.

## CONCLUSION

The Army intends to perform a controlled detonation of the lead azide at the Facility by November 24, 2026, to protect the public from the more significant and unacceptable threat of an uncontrolled explosion.

Respectfully submitted,

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

Dated: November 21, 2026

*/s/ David Mitchell*

DAVID D. MITCHELL
Environmental Defense Section
Energy and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 598-9737
david.mitchell@usdoj.gov

*Counsel for Respondents*

## CERTIFICATE OF SERVICE

I certify that on November 21, 2026, I electronically filed the foregoing notice via the Court's CM/ECF system, which will provide notice to all registered counsel.

*/s/ David Mitchell*
David D. Mitchell