**NOT SCHEDULED FOR ORAL ARGUMENT**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

| | |
|---|---|
| IOWA ENVIRONMENTAL COUNCIL, et al.,<br><br>*Petitioners*,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>*Respondents*. | Case No. 26-3374 |

**RESPONDENTS' OPPOSITION TO PETITIONERS' EMERGENCY MOTION FOR STAY**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 1

BACKGROUND ........................................................................................ 3

I. Legal Background ........................................................................................ 3

II. Factual Background ........................................................................................ 5

ARGUMENT ........................................................................................ 9

I. Even if the Court stays the Permit, the Army is not precluded from taking requisite emergency action. ........................................................................................ 9

II. The Court should lift the administrative stay and deny Petitioners' stay motion. ........................................................................................ 11

A. Petitioners are unlikely to prevail on the merits. ........................................................................................ 12

1. EPA reasonably authorized a controlled detonation to avert a more damaging uncontrolled explosion. ........................................................................................ 12

2. EPA reasonably crafted the Permit to include necessary terms and conditions to protect human health and the environment. ........................................................................................ 14

B. The equities overwhelmingly favor a controlled detonation over an uncontrolled one. ........................................................................................ 18

CONCLUSION ........................................................................................ 23

## INTRODUCTION

Sixty-eight drums of degraded lead azide, a primary explosive used in detonators, sit in two earth-covered magazines at the Iowa Army Ammunition Plant (the "Facility"). They could explode at any time. The lead azide has been stored in drums for decades and has recrystallized. It is now so sensitive to temperature, friction and shock that it cannot be safely moved, opened, or treated without a significant risk of explosion. And the risk of explosion only increases as winter weather arrives. To address this imminent and substantial endangerment, EPA issued an emergency permit authorizing the Army to conduct a controlled detonation ("the Permit"). Army munitions safety experts determined that controlled detonation is the only safe way to treat the waste, because every alternative requires disturbing material that may explode if disturbed.

The choice therefore is not between a detonation and no detonation. It is between a planned detonation (timed for favorable weather, preceded by public notice, and followed by monitoring and cleanup) and an unplanned explosion that could come at any moment, with no warning and no safeguards. The United States recognizes that the controlled detonation will release lead dust. But a controlled detonation is the only way to minimize the release. The Permit imposes numerous conditions to mitigate harm, including that the Army detonate only in favorable weather conditions to reduce dispersion of lead dust, run conservative modeling of

the projected dispersion, provide public notice, monitor, maintain records, and complete necessary cleanup. An uncontrolled explosion comes with none of these protections.

Moreover, a permit is not even necessary for the Army to take emergency action against an immediate threat from explosive material. *See* 40 C.F.R. § 270.1(c)(3)(i)(D). The Army's qualified explosives emergency specialist has determined that such a threat exists here. Col. Aaron C. Teller Decl. ¶¶ 8, 30. Even so, the Permit adds protections the public deserves.

Petitioners do not challenge EPA's finding that the lead azide waste poses an imminent and substantial endangerment. Yet they ask this Court to stay the Permit so that EPA can revisit alternative options. But the Army already has conducted that alternatives analysis, and its munitions experts concluded that there is no other safer option. Petitioners' proposed delay would leave an explosion hazard in place, with no end date as Iowa winter arrives. And the additional permit conditions Petitioners propose ignore the reality that some lead dust is unavoidable. The prevailing question is whether its release is controlled.

Petitioners have failed to meet their burden to prove a stay is warranted. They are not likely to prevail on the merits, and the equities weigh heavily against a stay. An uncontrolled explosion would inflict greater irreparable harm on the public than

a controlled detonation. Thus, the Court should lift the administrative stay, deny the stay, and permit the detonation to proceed under the Permit.

## BACKGROUND

### I. Legal Background

RCRA provides for regulation of solid and hazardous waste, from generation to disposal. *See* 42 U.S.C. § 6901 *et seq.*; *City of Chicago v. Env't Def. Fund*, 511 U.S. 328, 331-32 (1994). RCRA Subtitle C governs hazardous waste as defined under RCRA and EPA's regulations. *See* 42 U.S.C. §§ 6921-39g; 40 C.F.R. pts. 260-279.

Hazardous treatment, storage, or disposal ("TSD") facilities are subject to regulation under RCRA Subtitle C. *See* 42 U.S.C. § 6924(a). Owners and operators of TSD facilities generally must have a RCRA permit to operate. *Id.* § 6925(a). To issue a permit, the permitting authority–in this case, EPA–typically follows a notice and comment process under EPA's regulations. *See* 40 C.F.R. pt. 124.

But EPA's regulations also authorize EPA to issue emergency permits to address an imminent and substantial endangerment to human health or the environment. *Id.* § 270.61(a). Emergency permits are time limited, specify the covered waste and manner of treatment, require a public notice upon issuance, and "incorporate, to the extent possible and not inconsistent with the emergency situation, all applicable requirements" for RCRA permits and TSD regulations. *Id.*



Appellate Case: 26-3374 Page: 5 Date Filed: 11/22/2026 Entry ID: 5708599

§ 270.61(b). And for the most urgent situations, EPA's regulations do not require a permit for

> treatment or containment activities taken during immediate response to . . . [a]n immediate threat to human health, public safety, property, or the environment from the known or suspected presence of military munitions, other explosive material, or an explosive device, as determined by an explosive or munitions emergency response specialist[.]

*Id.* §270.1(c)(3)(i)(D).

In issuing a standard RCRA TSD permit, the permitting authority determines whether the TSD facility complies with RCRA's TSD regulatory standards. 42 U.S.C. § 6925(c)(1). RCRA regulations, through permits, impose generally applicable requirements on all TSD units, like facility standards, preparedness and prevention, and closure and post-closure care. *See* 40 C.F.R. pt. 264, subpts. A-H. There are also unit-specific regulations for particular categories of units, like containers, landfills, or incinerators. *See id.* pt 264, subpts. I-X. The unit in this case is classified as a "miscellaneous unit," a unit that does not fall into one of the specified categories. *See id.* §§ 264.601-.603. Permits for miscellaneous units "are to contain such terms and provisions as necessary to protect human health and the environment." *Id.* § 264.601.

In sum, EPA's regulations scale the process to the danger: standard permits for routine operations, emergency permits for imminent and substantial endangerments, and no permit at all for immediate responses to explosive threats.



Appellate Case: 26-3374 Page: 6 Date Filed: 11/22/2026 Entry ID: 5708599

## II. Factual Background

The Facility is a military installation in Middletown, Iowa, that loads, assembles, and packages medium- and large-caliber munitions. *See* Emergency Hazardous Waste Management Facility Permit for Storage and Treatment of Lead Azide, EPA RCRA ID No. IA7213820445 (the "Permit") at 1, Ex. 1. The Facility operates under a 2018 RCRA TSD permit. *Id.* In March 2026, the Army identified a stockpile of 68 drums in two earth-covered magazines that contained significantly degraded and unstable lead azide. Emergency Permit Approval Memorandum ("Approval Memorandum") at 1, Ex. 2. Lead azide poses an explosion hazard when it deteriorates. Borman Letter, dated Aug. 12, 2026 ("First Army Letter"), Ex. 3. Those risks increase in cold weather because the lead azide crystalizes, which increases the sensitivity of the lead azide—leading to an increased risk of an unintended explosion. Approval Memorandum at 2. In this condition, disruption like friction or movement poses an unacceptable risk of an uncontrolled explosion. *Id.*; First Army Letter. The drums cannot even be opened. Crystal growth inside the barrels and around the lids makes the lids unsafe to remove, so the water-ethanol solution that keeps the material stable has not been checked or replenished since September 2025, and evaporation has left it more prone to freezing. Teller Decl. ¶¶ 11–13.

EPA confirmed the lead azide stockpile as hazardous waste because of both its reactivity (tendency to explode) and its lead toxicity. Permit at 2. After determining that the location of the lead waste was not authorized for treatment, storage, or disposal under the 2018 permit, the Army applied for three successive emergency permits to continue storing the lead azide waste while it determined an appropriate treatment for it. *Id.*

In September 2026, the Army submitted a permit application proposing to treat the lead azide waste by a controlled detonation. *Id.* at 3. The Army's recommended course was based on an analysis of a range of treatment options. *Id.* at 2; First Army Letter. Army explosives safety experts determined that controlled detonation was the only safe option given the unstable condition of the waste. Borman Letter, dated Sep. 4, 2026 ("Second Army Letter"), Ex. 4. The Army concluded that open detonation (a kind of treatment under RCRA) of this waste at Army's already permitted Open Burn/Open Detonation Unit would involve moving the unstable lead azide and posed an unacceptable risk of an uncontrolled explosion. *Id.* at 2.

On November 13, 2026, EPA approved the Army's emergency permit application and issued the Permit based on three critical findings. First, EPA found that the lead azide waste posed an imminent and substantial endangerment because of the risk of an uncontrolled explosion. Permit at 1. Second, EPA credited the



Appellate Case: 26-3374 Page: 8 Date Filed: 11/22/2026 Entry ID: 5708599

Army explosives experts' assessment and treatment alternatives analysis, which found no safe treatment option other than detonation. Approval Memorandum at 3. EPA therefore found that treatment by controlled detonation was necessary to protect human health and the environment from the greater risk of an uncontrolled explosion. *Id.* at 2-3. Third, EPA found that a controlled detonation would allow the Army to time the operation to favorable weather conditions, reducing blast-debris dispersal, while also providing advance public notice and facilitating safe evacuation of nearby areas. *Id*. at 2-6.

EPA included numerous permit conditions to minimize the risks to human health and the environment, including maintenance of blast containment barriers, public notice requirements, weather restrictions that allow detonation only when dispersal of lead dust would be limited and directed away from large population centers, and lead dust remediation requirements over the area of possible dispersal. Approval Memorandum at 4-6; *see also* Permit §§ IV.D, IV.F–G, IV.O.3, IV.U–X, app. C. EPA required very conservative air modelling that assumes 100 percent of the lead waste would become airborne without considering that mitigation measures. Permit at 3, app. B, ¶ A. EPA also included conditions to minimize exposure from all potential sources (e.g., soil, air, etc.). *Id.* §§ IV.Q.1.i, IV.U.1, IV.V, app. C.

For notice, the Permit requires the Army to publicly distribute a preliminary air dispersion estimate at least five days before treatment, update it at least 48 hours



Appellate Case: 26-3374 Page: 9 Date Filed: 11/22/2026 Entry ID: 5708599

before treatment, and begin hourly updates six hours before detonation. *Id.* §§ IV.G.1.i–ii. The Army also must provide notices to explain the geographic extent and expected duration of potential exposure and to identify protective actions for residents and workers in areas of modeled deposition. *Id.*, app. C ¶¶ B.1.ii.e–f, B.2.i–ii.

The Permit also requires specific cleaning and dust-mitigation instructions for areas where projected surface deposition exceeds 100 micrograms per square foot. *Id.*, app. C, ¶ B.2.ii.b. The Permit separately requires monitoring at the facility and off site, a final air dispersion estimate within six hours after detonation, and corrective action (i.e., clean up) on and beyond the facility as necessary to protect human health and the environment. *Id.* §§ IV.Q.1.i, IV.G.1.iii, and at 3. Within 24 hours after treatment, the Army must initiate soil and high-touch-surface sampling at covered locations in the higher-deposition area where it has permission to enter. *Id.* § IV.U.2.ii.

On November 15, 2026, the Army issued a public advisory announcing that treatment was planned for November 20, 2026.[1] On November 19, 2026, Petitioners filed a petition for review and an emergency motion to stay the Permit. The Army

[1] Army, IAAAP Public Advisory (Nov. 15, 2026), https://www.army.mil/article/296772/iaaap_public_advisory [https://perma.cc/MR56-4C46].

then delayed the planned detonation to November 23, 2026.[2] Also on November 19, 2026, this Court administratively stayed the Permit until the Court rules on Petitioners' motion. The Army postponed the planned detonation to November 23, 2026, and then to November 24.[3] *See* Notice, Dkt. No. 5708596.

## ARGUMENT

### I. Even if the Court stays the Permit, the Army is not precluded from taking requisite emergency action.

There is an immediate risk that the lead azide at the Facility will spontaneously explode. Teller Decl. The waste has deteriorated to a degree that it is extremely sensitive to friction from crystal formation. *Id.* ¶ 9. The barrels holding the waste cannot be removed due to the risk of explosion, preventing the Army from taking measures to reduce the risk of explosion. *Id.* ¶¶ 12-13. As the temperatures drop, the risk of an uncontrolled explosion increases because the formed crystals can break more easily in freezing temperatures. *Id.* ¶ 13. If the crystals break, this could cause a chain reaction detonation that could cause an uncontrolled dispersal of lead azide into the environment. *Id.* ¶¶ 15, 17. Temperatures have already dropped below 30 degrees Fahrenheit, with temperature swings as low as 24 degrees and high as 70

---

[2] Army, Postponed: Lead Azide Detonation (Nov. 19, 2026), https://www.army.mil/article/296926 [https://perma.cc/WBS3-69HG].
[3] Army, Postponed: Lead Azide Detonation (Nov. 19, 2026), https://www.army.mil/article/296926 [https://perma.cc/WBS3-69HG].

degrees. *Id.* ¶¶ 28-29. These temperature swings have dramatically increased the risk of an uncontrolled explosion and threat to public safety. *Id.* ¶ 29.

Under these circumstances, EPA's RCRA regulations provide an exemption from both substantive and permitting requirements to allow immediate action. The RCRA regulations provide that the substantive standards "do not apply to":

> a person engaged in treatment or containment activities during immediate response to . . . [a]n immediate threat to human health, public safety, property, or the environment, from the known or suspected presence of military munitions, other explosive material, or an explosive device, as determined by an explosive or munitions emergency response specialist as defined in 40 [C.F.R.] § 260.10.

40 C.F.R. § 264.1(g)(8)(i)(D). The same exclusion from permitting requirements is at 40 C.F.R. § 270.1(c)(3)(i)(D).

Here, an explosive or munitions emergency specialist has made the requisite determination. Teller Decl. ¶ 3. Thus, EPA's RCRA regulations allow the Army to conduct a controlled detonation of the lead azide at the Facility even if the Permit that is at issue here is not in effect. Any other options require handling the lead azide in a way that poses an unacceptable risk of an uncontrolled explosion. *See id.* ¶¶ 6-17. A controlled detonation would minimize the risk associated with the resulting explosion. *See id.* ¶¶ 16-25. Thus, a controlled detonation is necessary now to respond to the immediate threat of an uncontrolled explosion at the Facility. EPA's regulations allow the Army's planned action without the need for a permit, and the Army intends to act on November 24, 2026.

## II. The Court should lift the administrative stay and deny Petitioners' stay motion.

A stay, like a preliminary injunction, "is an extraordinary and drastic remedy," and Petitioners have not made a "*a clear showing*" that one should be granted. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). They must demonstrate: (1) a likelihood of success on the merits; (2) irreparable injury if relief is withheld; (3) lack of harm to other parties from a stay; and (4) that a stay would serve the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). The third and fourth criteria merge here. *Id.* at 435. A stay is not a matter of right, even if irreparable injury might otherwise result." *Id*. at 433. Rather, courts "pay particular regard for the public consequences in employing the extraordinary remedy." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Accordingly, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. NRDC*, 555 U.S. 7, 24, (2008).

Petitioners have not made the requisite "clear showing," *Mazurek*, 520 U.S. at 972, that they are "likely" to prevail on the merits. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 349 (2024) (citation modified). EPA issued the Permit because the unstable lead azide at the Facility poses an imminent and substantial endangerment. Petitioners do not challenge that determination. Instead, they ask this Court to second-guess the agencies' technical judgments about the specific permit terms needed to protect human health and the environment during a controlled detonation.

The decision to authorize treatment by a controlled detonation was reasonable, and so were the permit terms to minimize risk. And the equities strongly favor a controlled, planned detonation over the imminent, uncontrolled one that the stay invites. Petitioners cannot show that the public will not be harmed if the Permit is stayed. The Court should deny the motion.

### A. Petitioners are unlikely to prevail on the merits.

RCRA imposes a high bar to reverse EPA permitting decisions under the Administrative Procedure Act standard of review. *See, e.g.*, *Mueller v. EPA*, 993 F.2d 1354, 1356 (8th Cir. 1993)*; Greenpeace, Inc. v. Waste Techs. Indus.*, 9 F.3d 1174, 1180 (6th Cir. 1993). And Petitioners' burden is even higher when an agency's decisions rest on highly technical judgments. *See Missouri ex rel. Bailey v. U.S. Dep't of Interior*, 73 F.4th 570, 581 (8th Cir. 2023). Plaintiffs have not made a clear showing they are likely to succeed.

#### 1. EPA reasonably authorized a controlled detonation to avert a more damaging uncontrolled explosion.

EPA reasonably determined that controlled detonation of the lead azide waste was necessary based on the imminent and substantial endangerment at the Facility. The crystallized, deteriorated lead azide waste is unstable and can explode spontaneously. Approval Memorandum at 2; First Army Letter. Army explosive experts evaluated the waste and determined that a mitigated, controlled detonation is the only safe treatment option. Approval Letter at 3; First Army Letter. In doing

so, the Army considered "the full range of potential alternative for the treatment of the lead azide," including in place treatment, thermal treatment, relocation of drums, and controlled detonation. Second Army Letter. The Army's technical consensus was that controlled detonation is the only safe option. *Id.* Other options that would disturb the containers, like in-place chemical neutralization, would create an unacceptable risk of an unintentional detonation. First Army Letter. And as the weather gets colder, the risk of unintentional detonation increases as crystal formation increases. Approval Memorandum at 2; First Army Letter.

EPA's determination that the controlled detonation was necessary to protect human health and the environment was reasonable because it is more protective than allowing the waste to unintentionally explode. In a controlled explosion, the Army accounts for weather conditions that limit the spread of lead dust. Approval Memorandum at 5-6. For example, the Army can detonate on a day when the wind is blowing away from population centers and at lower speeds that will reduce the geographic extent of lead dispersion. *Id.* Further, during a controlled detonation, the Army can ensure complete treatment of the waste. As EPA explained, "[t]he possibility of spontaneous detonation may result in greater harm to human health because the conditions of detonation would not be controlled to mitigate its impact." Approval Memorandum at 3. It was reasonable for EPA to give weight to the Army's munitions experts. And that is especially true where qualifying Army



Appellate Case: 26-3374 Page: 15 Date Filed: 11/22/2026 Entry ID: 5708599

munitions experts are empowered to take immediate action based on immediate threats even without a permit. *See* 40 C.F.R. § 270.1(c)(3)(i)(D).

Petitioners theorize that treatment alternatives other than controlled detonation, like chemical neutralization, may be feasible at the Facility. Mot. 18-22. But the Army's munitions experts considered those options and determined that they are not safe and pose an unacceptable risk of an unintentional explosion. Second Army Letter. Petitioners ignore the critical finding that even disturbing the containers poses an unacceptable risk because friction from any movement can set off an explosion. First Army Letter; Second Army Letter. EPA's and the Army's determination that a controlled detonation is necessary to protect human health and the environment is a highly technical judgment that warrants deference. *See Missouri ex rel. Bailey*, 73 F.4th at 581. The Court should not displace those expert judgments with Petitioners' unsubstantiated hope that a safer method might exist.

**2. EPA reasonably crafted the Permit to include necessary terms and conditions to protect human health and the environment.**

The terms that EPA included in the Permit were reasonable considering that a controlled detonation is necessary to protect human health and the environment. 40 C.F.R. § 264.601; *see* Permit at 1, 4 (noting that the Permit "incorporates by reference all *applicable* regulations of 40 C.F.R. Part 264, 266 and 270" (emphasis added)). EPA included the requirements necessary to mitigate exposure to lead dust,

Petitioners' principal concern. First, the Permit requires meaningful advance public notice so that people who may be exposed can protect themselves from potential exposure. Permit § IV.G.2.i, app. C, ¶¶ A, B.1.i.c, B.2; Approval Memorandum at 4. *See contra* Mot. 16-17 (arguing Permit does not have notice requirements). Second, the Permit requires containment barriers and limits detonation to weather conditions that will minimize the spread of lead dust and the number of people who could be exposed. Permit §§ IV.D, IV.F, IV.O.3; Approval Memorandum at 5-6. That includes wind speed and direction, which govern where and how far any resulting air dispersion can move. Permit §§ IV.G.1, IV.O.3.ii–iii, app. B ¶ A.1; Approval Memorandum at 5. Third, EPA included conditions to mitigate the risk of exposure through possible pathways: air, dust, soil, surface water and sediment, and groundwater. *See* Permit §§ IV.Q.1.i, IV.U.1, IV.V & app. C. Fourth, the Permit requires soil sampling and wipe sampling of high-touch structural surfaces at all parks, public facilities, and homes (where access is granted) within the area air modeling predicts lead dust will travel. Permit § IV.U.2.ii; Approval Memorandum at 6. The Army must begin sampling within 24 hours of detonation and the Army must submit a proposed work plan and schedule to remediate affected properties. Permit §§ IV.U.2.ii, IV.X; Approval Memorandum at 6.

Permit conditions that require blast containment barriers, public notice, limit the spread of lead dust, and require sampling and remediation where lead dust may



Appellate Case: 26-3374 Page: 17 Date Filed: 11/22/2026 Entry ID: 5708599

travel are reasonable. So is EPA's determination that those terms protect human health and the environment, given that a controlled detonation is necessary to address the imminent, substantial, and uncontested endangerment that an uncontrolled explosion poses.

Petitioners' insistence that the Permit terms are insufficient ignores that a controlled detonation is necessary to prevent an uncontrolled explosion. Petitioners fault EPA for authorizing any release of lead dust. But no option prevents every release here; the only choice is between a release the Army can manage and one it cannot. So EPA included conditions to minimize the spread of lead dust in the environment and risk from all potential exposure pathways. *See* Permit §§ IV.D, IV.F, IV.O.3, IV.Q.1.i, IV.U–V, app. C. Minimizing the risks associated with the necessary controlled detonation is the most protective option available considering the imminent and substantial endangerment that an uncontrolled explosion of lead azide poses. *See* 40 C.F.R. §§ 264.601(a), 270.61(b)(6); Approval Memorandum; Second Army Letter.

Moreover, Petitioners misunderstand the procedural requirements for an emergency permit. Petitioners fault EPA for not putting the Permit out for notice and comment. Mot. 22-23. But notice and comment is not required for emergency permits. *See* 40 C.F.R. § 270.61. Nor must EPA provide public access to the entire permit record, including the complete permit application, *id.*, as plaintiffs claim,


Appellate Case: 26-3374 Page: 18 Date Filed: 11/22/2026 Entry ID: 5708599

Mot. 14-15. Emergency permits require only limited public notice. 40 C.F.R. § 270.61(b)(5). In fact, emergency permits can be issued orally, with a written permit issued five days later. *Id.* § 270.61(b). Petitioners do not challenge EPA's use of an emergency permit or its imminent and substantial endangerment finding, and thus have no basis to fault EPA for skipping procedures that EPA's regulations do not require.

Petitioners also argue that the Permit does not contain conditions to address releases to various kinds of land, groundwater, and surface water. Mot. 15-16. But the Permit's exposure-pathway conditions address exactly those releases. *See, e.g.*, Permit §§ IV.F, IV.O.3, IV.U-V. Petitioners again separate the Permit's terms from their context and assess their protectiveness without regard for EPA's reasonable determination that this is an emergency situation and the controlled detonation is necessary.

Petitioners also are wrong that the Permit does not require corrective action. Mot. 17-18. The Permit requires sampling and necessary corrective action as noted above. *See* Permit at 3 and §§ IV.Q.1, IV.R.1, IV.U.2.ii.

Finally, Petitioners' insistence that EPA must include provisions for vulnerable populations like children and pregnant women ignore both the notice requirements, which will allow these populations to take actions to minimize risk and the specific requirements to test at parks and public facilities, such as

playgrounds. Permit § IV.U.2.ii, app. C, ¶¶ B.1.ii.d, B.2, D.6. It also ignores the far greater risk to those same populations from an uncontrolled explosion. Fundamentally, Petitioners argue for delay while the circumstances demand action under the reasonable and lawful conditions of the Permit. They also ask this Court to overrule EPA's technical judgment about the protectiveness of the Permit's terms, which likewise is a highly technical judgment. Like EPA's and the Army's determination that a controlled detonation is necessary, that technical judgment deserves deference. *See Missouri ex rel. Bailey*, 73 F.4th at 581.

### B. The equities overwhelmingly favor a controlled detonation over an uncontrolled one.

The United States acknowledges that a controlled detonation will likely cause airborne lead. *See* Mot., Ex. C. But the Permit that Petitioners seek to stay includes full-scale mitigation measures—from before, during, and after detonation—to enhance protection of human health and the environment. And the Army intends to act consistent with the permit conditions regardless of whether the Permit is in effect. Notice at 5, Dkt. No. 5708596.

Petitioners' focus on the lead released by the planned, controlled detonation, and their request to delay this action, ignores the gravity of the situation facing the public absent action by the Army. *See* Mot. at 23-27. As Petitioners do not dispute, the lead azide has recrystallized and become sensitive to shock and friction. *See* Mot. at 3. Even small movements in or around the magazines could set it off.

Particularly with colder temperatures, the water-ethanol mixture surrounding the lead azide will cycle through freezing and thawing, which in turn will create friction and increase the risk of an unintentional explosion. Approval Memorandum at 2-3; Teller Decl. ¶¶ 6, 9, 28-29. And the danger is climbing where the magazines' blast doors are gone, the stabilizing solution has not been replenished in more than a year, and temperatures have swung between 24 and 70 degrees in a single week before dipping below freezing. Teller Decl. ¶¶ 13, 27-29.

Moreover, an unintentional explosion can also result in an incomplete detonation and thus cause the explosive material to disperse onto neighboring communities. *Id.* ¶ 17. In short, the public faces an environmental and health threat that must be promptly addressed. *See id.* ¶¶ 8, 12-17, 29-30; *see* Jim Macy Decl. ¶¶ 14-16; Mot. at 25-26.

So the question is whether the public would be at greater risk of irreparable injury from a planned, controlled detonation or from an imminent, *uncontrolled* explosion with no public notice or safety measures in place to mitigate the risks from lead dispersion. *See* Teller Decl. ¶¶ 18-25 (describing mitigation efforts); Macy Decl. ¶ 25; *cf.* Mot. at 27 (stating that EPA's permitting decision must balance the risk of an unplanned explosion versus a planned detonation). The answer is not close. The status quo is not safe; instead, it is the danger.

Contrary to Petitioners' assertion that an unplanned explosion is merely "possibl[e]," Mot. 27, the unfortunate reality is that the risk of a lead azide detonation is immediate, Teller Decl. ¶¶ 8, 30. Given recent temperature swings and the arrival of freezing weather, the Army's explosives emergency specialist has found "an intolerable likelihood of spontaneous explosion that threatens public safety." Teller Decl. ¶¶ 8, 28-30; *see* Macy Decl. ¶ 15, 25. And because the stabilizing solution has been evaporating for more than a year, it is more likely to freeze inside the barrels, where even a small amount of friction can set off an explosive chain reaction. Teller Decl. ¶¶ 13-14. All the harms Petitioners describe in their stay motion would come to pass, and worse, if the lead azide detonates on its own. *See* Mot. at 23-24.

Under the delay that Petitioners seek with their delay request, the public faces greater risk of irreparable harm from lead inhalation and contamination, because no one can know when an uncontrolled explosion will occur. *See* Macy Decl. ¶ 22. If Petitioners were to have their way, the public, Army Personnel and EPA would have no advanced warning that lead may be in the air. *See* Permit § IV.G.1-.2. And EPA and the Army would be hindered in their ability to provide the public with close to real-time air dispersion modeling to inform the public of the potentially impacted area. *See* Macy Decl. ¶ 32. Further, an uncontrolled explosion may occur in adverse meteorological conditions and may cause lead to disperse over a greater geographic scope or densely populated areas. Approval Memorandum at 5-6; Macy Decl. ¶ 24.



Appellate Case: 26-3374 Page: 22 Date Filed: 11/22/2026 Entry ID: 5708599

The Army may be unable to implement its complete set of mitigation and control measures beforehand to minimize lead dispersion. *See* Macy Decl. ¶ 31 (noting that the Permit requires the Army to conduct extensive sampling to examine the extent of contamination produced by the detonation soon after the Army acts).

And an uncontrolled explosion may result in some lead azide catapulting onto neighboring properties and detonating there. Teller Decl. ¶ 17. Incomplete destruction would also create "an extremely unsafe condition" for cleanup crews and leave "an ongoing explosives safety issue in the impacted area." *Id.* In short, a stay trades a managed risk for an unmanaged one.

Conversely, the Permit and the Army's planned, controlled detonation will significantly reduce these risks. *See* Approval Memorandum at 4. The Permit identifies weather conditions intended to reduce lead exposure, disperse in less densely populated areas, and prevent harm to the individuals conducting the detonation. *See* Permit §§ IV.D, IV.F, IV.O.3; Approval Memorandum at 5-6. And before detonating, the Army will take numerous mitigation measures. Teller Decl. ¶¶ 18-25. The Army will provide frequent forecasts of the projected air dispersion using a model that includes conservative estimates (i.e., the model assumes that additional safety measures the Army will implement will not reduce lead dispersion) to update the public on where the lead will likely disperse. *See* Permit at 3 and §§ IV.G.1.i-ii, at 10; app. B ¶¶ A–B. The Army will wet the area of the planned

detonation to limit the spread of lead in the air. Teller Decl. ¶ 22. Upon detonation, the Army will sample those impacted areas within 24 hours and remediate properties adversely affected. Permit at 3 and § IV.U.2. In sum, the Permit and the Army's controlled detonation significantly reduces the environmental and public health harms that may imminently result from a spontaneous explosion.

Petitioners' other equitable argument—that there is no public interest in perpetuating an unlawful agency action—fails because Petitioners are unlikely to succeed on the merits. *See* above Arg. I.A. And as Petitioners acknowledge, the equities often favor protecting the environment. *See* Mot. at 25 (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987)). Here, denying the stay is what better protects public health and the environment.

The Army has delayed detonation by three days now. But every day of delay increases the risk of an uncontrolled explosion that will cause far greater public health and environmental harm than the planned, controlled detonation initiated under the protective terms of the Permit.

Thus, the equities weigh decisively against a stay. And Petitioners are not likely to prevail on the merits. EPA's approval of the Permit was reasonable considering the imminent and substantial endangerment the threat of an uncontrolled explosion poses. Petitioners have not met their burden to show that the extraordinary and drastic remedy of a preliminary stay is warranted.



Appellate Case: 26-3374 Page: 24 Date Filed: 11/22/2026 Entry ID: 5708599

## CONCLUSION

For the foregoing reasons, the Court should lift the administrative stay and deny Petitioners' motion.

Respectfully submitted,

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

*/s/ David Mitchell*
DAVID D. MITCHELL
Environmental Defense Section
Energy and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 598-9737
david.mitchell@usdoj.gov

*Counsel for Respondents*

*Of Counsel:*
LAUREL CELESTE
Office of the General Counsel
U.S. Environmental Protection Agency
Washington, D.C.

JARED PESSETTO
Office of Regional Counsel
U.S. Environmental Protection Agency
Lenexa, Kansas

Dated: November 22, 2026



Appellate Case: 26-3374 Page: 25 Date Filed: 11/22/2026 Entry ID: 5708599

## CERTIFICATES OF COMPLIANCE

I hereby certify that this motion complies with the requirements of Fed. R. App. P. 27(d)(2)(A) because it contains 5,169 words according to the count of Microsoft Word, excluding the parts of the motion exempted by Fed. R. App. P. 32(f), and therefore is within the word limit of 5,200 words.

I further certify that this motion complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally-spaced font, and is double-spaced, except for headings, block quotes, and footnotes.

Dated: November 22, 2026

/s/ *David Mitchell*
DAVID MITCHELL

*Counsel for Respondents*