**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

| | |
|---|---|
| IOWA ENVIRONMENTAL COUNCIL, et al.,<br>*Petitioners,*<br>v.<br>U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,<br>*Respondents.* | Case No. 26-3374<br><br>**DECLARATION OF JIM MACY IN SUPPORT OF RESPONDENTS' OPPOSITION MOTION** |

I, Jim Macy, in accordance with 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief and that they are based upon my personal knowledge, information contained in the records of the United States Environmental Protection Agency ("EPA"), or information supplied to me by EPA employees under my supervision and in other EPA offices:

**Professional Background**

1. I am the Regional Administrator of EPA Region 7, based in Lenexa, Kansas. I have held this position since January 26, 2025. Prior to becoming the Regional Administrator I held several leadership positions in state government. From March 2015 to April 2024, I served as director of the Nebraska Department of Environmental Quality, leading that organization through governmental merger into the Nebraska Department of Water, Energy, and Environment. For 28 years prior to my leadership in Nebraska, I served in numerous roles at the Missouri Department of Natural Resources. I have a Bachelor of Science in Agriculture and hold a Master's in Education, both earned from the University of Missouri-Columbia.

**Delegated Legal Authority**

2. Among many other functions, EPA Region 7 is responsible for issuing permits to hazardous waste treatment, storage, and disposal facilities under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901, et seq., in the state of Iowa. This is the only state in EPA Region 7—consisting of Iowa, Kansas, Missouri, and Nebraska—that is not federally authorized to implement the RCRA hazardous waste programs.

3. As Regional Administrator, I hold delegated authority to perform all actions necessary to issue, deny, modify or revoke and reissue permits for owners and operators of hazardous waste treatment, storage and disposal facilities pursuant to Section 3005 of RCRA.

4. RCRA and its implementing regulations authorize EPA to issue emergency permits in certain circumstances. Specifically, upon a finding of an imminent and substantial endangerment to human health or the environment, I may issue a temporary emergency permit to a permitted facility to allow treatment, storage, or disposal of a hazardous waste not covered by an effective RCRA permit. *See* 40 C.F.R. § 270.61(a)(2).

5. On November 13, 2026, I exercised this authority to issue an emergency permit to the United States Department of Army for the storage and treatment of waste lead azide at the Iowa Army Ammunition Plant ("IAAAP").

**Permitting History**

6. In September 2018, the EPA issued the Army a hazardous waste management permit for IAAAP. Among other permit conditions, the RCRA permit limits the Army's storage and treatment of reactive hazardous wastes to specific quantities and to specific areas at IAAAP.

7. On or about March 12, 2026, the Army notified the EPA of the presence of degraded lead azide at IAAAP in a secure storage location that is not covered by the Army's 2018 RCRA permit.

8. On March 24, 2026, the Army submitted to the EPA an application for an emergency permit to store the lead azide material at IAAAP in compliance with RCRA. The Army's storage application designated the lead azide at IAAAP as a hazardous waste due to its reactive and toxic characteristics. As documented in that application, lead azide is a chemical compound used as an initiating explosive in ordnances such as that produced at IAAAP. The Army's application also documented that long-term storage of the lead azide at IAAAP had led to recrystallization of the material within the storage containers. The application further documented that crystal formation increases the risk of spontaneous detonation because the crystalized form of lead azide is significantly more sensitive to shock and friction.

9. On April 2, 2026, the EPA issued the Army an emergency permit for storage of lead azide waste at IAAAP. In accordance with the authorizing RCRA regulation, EPA's emergency permit allowed such storage for only 90 days. The agency issued public notice of the permit's issuance in *The Hawk Eye* newspaper of Burlington, Iowa, on May 7, 2026.

10. The EPA authorized the Army's continued storage of the lead azide waste at IAAAP through the issuance of two more 90-day emergency permits dated July 1 and September 29, 2026. Public notices describing EPA's issuance of the subsequent emergency permits were published in *The Hawk Eye* on July 11 and November 3, 2026, respectively.

**The Army's Application for an Emergency Permit for Storage and Treatment**

11. The EPA's three prior storage permits allowed enough time for the Army and EPA to complete several critical activities. First, the Army completed an evaluation of treatment

alternatives for the lead azide waste at IAAAP. Second, having concluded that there are no safe alternatives to intentional detonation for the treatment method of the lead azide waste at IAAAP, the Army remained in routine communication with EPA as it prepared and then submitted a permit application for both storage and treatment of the lead azide waste. Third, concurrent with its preparation of the permit application, the Army devoted resources to planning and training for implementation of the planned detonation. Importantly, each of these activities occurred during the spring and summer months when, according to the Army, the lead azide waste at IAAAP remained in its most stable condition.

12. I understood that the Army's engagement with EPA's RCRA permitting process would enhance the protectiveness of treatment activity that the Army could choose to implement without a RCRA permit in accordance with EPA's regulations. I directed my staff to remain in routine contact with the Army to establish substantive expectations for the Army's eventual permit application.

13. Beginning in September 2026, the Army submitted to EPA an emergency permit application for storage and treatment through rolling submission of documents. As is typical for any RCRA permit, EPA conducted a thorough review of the permit application and transmitted substantial comments to the Army for revision and resubmission of the material for EPA's final consideration. As revised, the Army's permit application and other correspondence provided EPA adequate information to support my approval of an emergency permit for storage and treatment.

**Imminent and Substantial Endangerment**

14. The Army's permit application for storage and treatment documented that crystallized lead azide is highly sensitive to shock, friction, impact, heat, flame, and static discharge.

15. The Army's permit application further indicated that "temperature fluctuations can cause small amounts [of lead azide] to dissolve and recrystallize into its pure state as needles, platelets, and crystals." In correspondence to the EPA, the Army communicated that the risk of spontaneous detonation will increase as the outdoor temperature decreases toward freezing.

16. The Army's documentation of the condition of the lead azide waste, as well as the condition and configuration of its storage, support EPA's finding of an imminent and substantial endangerment to human health and the environment.

**Evaluation of Treatment Alternatives**

17. During the permit application process, the Army submitted information documenting the activities that it undertook to evaluate alternatives to open detonation for the treatment of the lead azide waste at IAAAP.

18. In a letter dated August 12, 2026, the Army emphasized the instability of the lead azide waste at IAAAP and communicated that it had evaluated alternatives to open detonation. The Army stated that intentional detonation was determined to be "consistent with the 'Cardinal Rule of Explosives Safety', which requires that we expose the minimum number of people to the minimum amount of explosives for the minimum amount of time."

19. In a letter dated September 4, 2026, the Army outlined its process for considering the range of potential alternatives. In relevant part, the Army stated that it activated an

"operational planning team" to explore potential treatment alternatives and develop an actionable plan that considered the acute explosive hazard associated with the material. The Army engaged personnel from other federal agencies throughout the process, including the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). The letter explained as follows:

> From January through April 2026, this multi-agency working group spent many hours conducting extensive literature searches, technical evaluations, and risk analyses of the full range of potential treatment alternatives. The [operational planning team] also performed blast effect analysis, explosives safety quantity distance calculations using advanced modeling and simulation, atmospheric plume modeling, and testing of specialized protective engineering controls. During the development and evaluation of potential alternatives, safety was identified as the single threshold criterion: a fundamental standard and mandatory requirement that must be satisfied for a potential alternative to be considered for selection and implementation.

20. The Army's letter reported that "[t]he following broad categories of alternatives were considered: (1) in-situ chemical treatment; (2) closed-chamber thermal treatment; (3) relocation of individual drums for treatment by open detonation; and (4) intentional detonation inside the earth covered magazines."

21. According to the Army's letter, this working group evaluated various reagents for in-situ treatment of lead azide. The letter reported as follows:

> This evaluation included the proprietary reagent MuniRem®, as well as sodium hydroxide, potassium bichromate, sodium nitrite, glacial acetic acid, and ceric ammonium nitrate. All methods of in-situ chemical treatment, regardless of reagent, require the drums to be opened to initiate the treatment. Potential migration of lead azide crystals into the lid rings and closure gaskets present an acute risk of unintentional detonation if an attempt is made to open the drums. Opening the drums requires the application of rotational torque that can create localized friction and shear forces that exceed the ignition threshold of the lead azide. Furthermore, chemical treatment requires physical mixing to achieve direct reagent-to-compound contact. Inserting mechanical impellers, chemical sparge wands, ultrasonic agitation devices, or other tools into the drums can introduce pinch points, cutting friction, and shear forces, resulting in risk of uncontrolled detonation.

Based on these factors, the working group "unanimously agreed that all alternatives involving in-situ chemical treatment failed to meet the threshold [safety] criterion."

22. The Army's letter also summarized the reasons that closed-chamber thermal treatment was eliminated from consideration:

> On- and off-site closed-chamber thermal treatment, in both an armored, fuel-fired deactivation furnace and a rotary kiln incinerator, and relocation of individual drums for treatment by open detonation were also evaluated. These methods of treatment require manipulation and relocation of the drums, either by Army personnel or remotely operated equipment. Physical lifting, tilting, rigging, or reorienting of the drums using conventional forklifts or remote robotic systems generates internal movement, shifts the drum contents, and introduces drop risk, all of which could spark rapid auto-ignition resulting in unintentional detonation. Transporting the drums over interior floors, loading aprons, conveyor rollers, or roadways exposes the contents to continuous vibrational harmonics, transit shocks, and mechanical jolts. Under these conditions, an initiation in a single drum would propagate instantly across adjacent containers, resulting in an uncontrolled detonation. Based on these considerations, [the working group] universally agreed that all alternatives requiring manipulation or relocation of the drums do not meet the threshold criterion.

23. After receiving these letters, my staff consulted with EPA's subject matter experts in munitions and hazardous waste treatment, who did not question that the Army's analysis was consistent with the available information. Relying on their technical judgment, I concluded that this information documented sufficient consideration of alternative treatment methods in light of the limited time available and the emergency situation posed by the continued storage of crystalized lead azide in the upcoming winter weather. I further acknowledged that the information the Army provided, as reviewed by my staff, supported the Army's conclusion that the lead azide at IAAAP cannot be safely disposed of through any mode of treatment other than intentional detonation. In recognizing this conclusion, I also respected that the Army has unparalleled expertise in matters concerning explosives safety.

24. Based on all of these factors, I recognized that intentional detonation allows for minimal human interaction with the containers of lead azide waste; enables the Army to time the treatment activity to align with favorable weather conditions; allows the Army an opportunity to



Appellate Case: 26-3374 Page: 7 Date Filed: 11/22/2026 Entry ID: 5708599

provide prior public notifications to the potentially affected surrounding communities; and positions the Army for swift environmental response.

**Optimizing Protectiveness of the Emergency Permit**

25. The timeliness of EPA's emergency permit—and the Army's readiness to implement the activity that it authorizes—is critical to the protection of human health and the environment. To make the permit optimally protective, EPA's permitting decision had to balance competing risk factors. On one hand, the permit had to impose requirements that mitigate the environmental impact and human health risks that will inevitably result from the treatment activity. On the other hand, the permit could not be so constraining that the Army would be unable to complete the treatment activity before winter conditions increase the chance of spontaneous explosion.

26. In light of these challenging circumstances, EPA's emergency permit requires the Army to take concrete actions before, during, and after the detonation to enhance protection of human health and the environment. The requirements take the form of special permit conditions that are designed to mitigate the exposures, to the extent feasible, and to remediate the contamination that EPA expects will result from the detonation. Broadly speaking, these risks are presented both on the IAAAP installation itself and, more critically, in the off-site areas that will be affected by airborne lead migration and deposition.

27. After careful review of the Army's permit application, my staff informed me that off-site risk to human health arises from two potential pathways of exposure to lead. The first exposure pathway is from inhalation, dermal contact, and incidental ingestion of lead suspended as a particulate in ambient air. In addition, the airborne transport of lead is expected to result in the deposition of lead particles at varying concentrations across the path of dispersion. Air

dispersion modeling performed by the Army and by trained members of its own staff clearly indicated that dust-lead deposition is expected to occur at higher concentrations closer to the detonation site and to decrease with distance from IAAAP.

28. To address the air and dust exposure pathways, an essential requirement of the emergency permit is timely public notification of expected exposure risk in areas where air dispersion modeling predicts potential airborne lead migration and dust deposition. To implement such notifications, my staff developed special permit conditions that require the Army to iteratively model projected airborne migration and dust-lead deposition areas. With each iteration, the Army is required to publicly distribute updated imagery of the potential impact area and to provide members of the public with information about protective actions that should be taken within those areas. In practice, implementation of this public notification requirement allows people within affected areas to make informed decisions that minimize their exposure to lead. To maximize such precautionary measures, the permit requires the Army's modeling to utilize conservative parameters that ensure the modeling outputs do not under-predict the extent of potential impact. Specifically, the required modeling assumes that 100 percent of lead content in the lead azide waste will be released to the ambient air, an assumption that both Army and EPA technical teams agree is not realistic but nevertheless necessary for maximal public awareness of potential risk.

29. In addition to public notification, the Emergency Permit aims to mitigate off-site exposures by defining adverse meteorological conditions during which the detonation must not occur. As indicated in the Army's permit application, weather conditions at the time of detonation not only affect the operational safety of the treatment activity itself but also the anticipated environmental and human health effects that may result. Most significantly, both



Appellate Case: 26-3374 Page: 9 Date Filed: 11/22/2026 Entry ID: 5708599

Army and EPA air dispersion modeling indicates that wind speed and direction will influence the path and scale of the expected depositional and airborne impact areas. For that reason, EPA's permit establishes minimum and maximum wind speeds at the time of detonation. The permit also stipulates that the Army should exercise careful judgment to avoid dates on which wind direction will disperse lead over heavily populated areas lying to the east of IAAAP.

30. As explained, the Army and EPA modeling indicates that dust deposition will occur off-site, and likely in areas accessible to human exposure. To address this risk, the Emergency Permit requires the Permittee to initiate soil and dust sampling at both public and private properties in the area of projected dust deposition and to do so within 24 hours of the treatment activity to identify. After this sampling, the Permittee is obligated to transmit the validated sampling data to the EPA and concurrently submit a proposed work plan and schedule to implement the dust remediation activity for affected properties.

31. For environmental impacts within and immediately near IAAAP's fenceline, the permit requires the Army to conduct extensive sampling of soil, surface water, sediment, and groundwater to determine the extent of contamination produced by the detonation. The results of this sampling will guide cleanup activities the Army is required to implement to ensure that all environmental impacts are remediated to regulatory standards.

32. The public notification, sampling, and cleanup requirements in EPA's emergency permit highlight the clear advantage of conducting the detonation under controlled conditions. If the explosion is allowed to occur in a spontaneous, unplanned manner then the public will have less time to plan for and take self-protective measures for themselves and their families.

33. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 22nd day of November, 2026, in Lenexa, Kansas.

JAMES MACY

Digitally signed by JAMES MACY
Date: 2026.11.22 09:50:18 -06'00'

Jim Macy
Regional Administrator
U.S. Environmental Protection Agency, Region 7