# EXHIBIT 2

REGION 7
LENEXA, KS 66219

November 13, 2026

**MEMORANDUM**

**SUBJECT:** Request for Approval of Emergency Permit for Storage and Treatment of Lead Azide
Iowa Army Ammunition Plant
17571 Des Moines County Highway 79
Middletown, Iowa 52638-5000
EPA RCRA ID No.: IA7213820445

**FROM:** Patricia Murrow, LCRD/Corrective Action Branch

PATRICIA MURROW
Digitally signed by PATRICIA MURROW
Date: 2026.11.13 12:44:12 -06'00'

Jared Pessetto, ORC/Superfund Branch

JARED PESSETTO
Digitally signed by JARED PESSETTO
Date: 2026.11.13 12:40:26 -06'00'

**THRU:** Eric Gorman, Manager
Corrective Action Branch
Land, Chemical and Redevelopment Division

ERIC GORMAN
Digitally signed by ERIC GORMAN
Date: 2026.11.13 12:53:25 -06'00'

Bob Jurgens, Director
Land, Chemical and Redevelopment Division

ROBERT JURGENS
Digitally signed by ROBERT JURGENS
Date: 2026.11.13 12:56:56 -06'00'

**TO:** Jim Macy, Regional Administrator
Region 7

Attached for your signature please find an Emergency Permit for Storage and Treatment ("Emergency Permit") (Attachment 1) that has been prepared for issuance to the U.S. Army ("Army" or "Permittee"). The Emergency Permit authorizes the Permittee to store and treat waste lead azide at the Iowa Army Ammunition Plant (IAAAP) located in Middletown, Iowa.

**Background**

In March 2026, the Army notified the EPA that 68 containers of unstable lead azide had been discovered in two bunkers at the facility. At the time of the discovery, the lead azide was crystalizing, in a dangerous and unstable condition, raising concerns that it could self-detonate. After further investigation, the Army determined the lead azide was in a somewhat more stable condition than



Appellate Case: 26-3374 Page: 2 Date Filed: 11/22/2026 Entry ID: 5708599

initially believed, but that the containers could not be safely transported. In May 2026, the Army concluded that intentional detonation would be the only safe course of treatment for such an unstable, shock-sensitive explosive.

To date, the Permittee has applied for, and the EPA has issued, three 90-day emergency permits for in-place storage of the lead azide. The EPA has issued each succeeding permit prior to expiration of the prior permit, with a legal notice published in the Hawk Eye newspaper announcing the issuance of the permit and the availability of the Administrative Record. The third emergency permit for storage expires on December 29, 2026. Issuance of this Emergency Permit will supersede the third storage permit.

Region 7 has maintained regular weekly calls with the Army's personnel to encourage timely development of the emergency permit application for treatment. The EPA has also sent numerous letters to the Army outlining the expected contents of the application and requesting additional information to ensure a complete application is submitted. Army's October 2026 permit application proposes a controlled treatment activity of the containers of waste lead azide by simultaneous detonation. The containers will stay within the bunkers where explosive charges and an accelerant will be placed on/next to each drum.

**Legal Authority**

This Emergency Permit is being issued upon the EPA's finding of an imminent and substantial endangerment to human health and the environment pursuant to the Solid Waste Disposal Act (Sections 3004(a), (u), (v), and 3005 of the Resource Conservation and Recovery Act, or RCRA (42 U.S.C. §§ 6924(a), (u), (v); 6925)) and regulations promulgated thereunder (Title 40 of the Code of Federal Regulations (C.F.R) Part 264, Subpart X; section 270.61). Pursuant to 40 C.F.R. § 270.61(a)(2), if the Director (defined by regulation as the "the Regional Administrator . . . or an authorized representative") "finds an imminent and substantial endangerment to human health or the environment the Director may issue a temporary emergency permit . . . to a permitted facility to allow treatment, storage, or disposal of hazardous waste not covered by an effective permit." The EPA issued Army a RCRA permit in 2018 ("2018 RCRA Permit"), but that permit does not address this storage and treatment location or proposed treatment method.

Conditions supporting issuance of an emergency permit pursuant to 40 C.F.R. § 270.61(a)(2) are present. First, the lead azide in storage at IAAAP is a RCRA hazardous waste with waste codes D003 (reactivity) and D008 (toxicity characteristic for lead). Second, the storage location and off-site areas that will be affected by intentional detonation of this waste are not covered by the 2018 RCRA Permit, nor is this treatment method of lead azide authorized under that permit. Third, the current conditions at IAAAP create an imminent and substantial endangerment to human health and the environment. Due to deterioration during long-term storage, the lead azide is in an unstable, crystallizing state. Crystal formation increases the probability of spontaneous detonation because the crystalized form of lead azide is significantly more sensitive to shock and friction. With colder temperatures now approaching in Iowa, the water-ethanol mixture that surrounds the cotton bags of lead azide in each container would begin to cycle through freeze and thaw conditions, creating friction within the containers. Importantly, the bunkers in which the waste is stored are not temperature controlled, and although they were designed to mitigate blast impacts, they were not constructed to withstand an



Appellate Case: 26-3374 Page: 3 Date Filed: 11/22/2026 Entry ID: 5708599

intentional detonation of this magnitude. The possibility of spontaneous detonation may result in greater harm to human health because the conditions of detonation would not be controlled to mitigate its impact.

**Public Notice & Administrative Record**

Pursuant to 40 C.F.R. § 270.61(b)(5), the EPA has prepared a public notice of the Emergency Permit's issuance for direct distribution to more than 3,000 addressees in the communities near IAAAP. In addition, this legal notice will be published in the *Hawk Eye* and *Des Moines Register* newspapers.

Attachment 2 lists documentation included in the Administrative Record (AR) that has been prepared for this Emergency Permit pursuant to 40 C.F.R. § 124.18(c). The AR includes draft permit application material submitted by the Permittee, the EPA's comments on the draft material, and the Permittee's revised application submittals. Additionally, as part of its permit application, the Army submitted information to the EPA describing the treatment alternatives it considered prior to identifying intentional in-place detonation as the only safe treatment technology for the lead azide waste in its present condition. Representatives of the EPA also attended an April 2026 briefing at which treatment alternatives were presented to senior Army leadership. The Army's correspondence and a PowerPoint presentation from the April 2026 briefing are included in the AR to document compliance with 40 C.F.R. § 265.382. The Army has unparalleled expertise in matters concerning explosives safety. Intentional detonation allows for minimal human interaction with the containers of waste lead azide, enables the Permittee to conduct the treatment activity during favorable weather conditions, and allows the Permittee opportunity to provide prior notifications to the potentially affected surrounding communities.

**Special Emergency Permit Conditions**

The Permittee's intentional detonation of lead azide will cause a significant release of lead into the environment that presents numerous routes of potential human and ecological exposure. The exposure risk presented by the treatment activity has both on- and off-site components. To make the Emergency Permit optimally protective of human health and the environment, the EPA has incorporated special permit conditions that are summarized in Attachment 3.

<u>On-Site Impacts</u>

Within IAAAP's fenceline, the detonation is expected to result in contamination of soil, surface water, sediment, and groundwater. Upon conducting the detonation, the Permittee is required to activate and implement its Contingency Plan for Treatment to ensure worker safety. After the detonation, the Permittee will implement the environmental monitoring program and the Closure Plan to characterize and clean up detonation-related contamination on the IAAAP property. The Emergency Permit also obligates the Permittee to utilize the step-out sampling protocols set forth in its Permit Application to identify any contaminants that deposited in soils, groundwater, surface water and sediment beyond the facility's boundary. Due to IAAAP's security restrictions, potential human exposure to detonation-related contaminants surrounding the treatment area will be prevented during implementation of the remedial activities.



Appellate Case: 26-3374 Page: 4 Date Filed: 11/22/2026 Entry ID: 5708599

Off-Site Impacts

In addition to treatment-related impacts within IAAAP, the detonation is expected to generate fine lead-oxide particles that will become airborne, travel downwind at distance from the facility, and deposit at ground-surface. This downwind dispersion and deposition of airborne lead presents significant potential for human exposure. The Emergency Permit seeks to mitigate such risk through permit conditions that: 1) require the Permittee to provide meaningful prior public notifications; 2) avoid detonation during defined adverse meteorological conditions and dates that would be likely to impact densely populated downwind areas; and 3) obligate the Permittee to immediately sample and remediate properties impacted by downwind deposition above a regulatory threshold.

*Public Notifications*

The first measure of protectiveness is prior public notification of risk posed to areas that will possibly be impacted by airborne dispersion and deposition of lead resulting from the detonation. To implement these notifications, the Emergency Permit obligates the Permittee to model depositional impacts and airborne plume migration prior to any targeted detonation date using weather conditions that are forecasted for the date/time of detonation. The modeling outputs must be updated and publicly distributed at specific intervals before the targeted detonation date. The first public notification must occur five days before detonation, followed by an updated notification two days prior, and then hourly updates beginning 6 hours before the detonation is scheduled to occur. The intent of such iterative modeling is to refine the predicted impact area based on more accurate weather forecasting. This will provide the public with as much certainty as possible regarding expected geographic impact of both deposition- and air-related impacts resulting from the detonation.

Importantly, the required modeling must utilize a conservative coding input to ensure that the Permittee's modeling does not under-predict the extent of potential impact. *See* Attachment 4. Specifically, the modeling must be calculated using an Emission Factor of 1.00, which is a coding parameter that assumes 100 percent of lead content will be released to the ambient air. Technical experts from both the EPA and the Army agree that this is an overly conservative assumption and will not be necessarily representative of actual conditions that result from the treatment activity. The EPA acknowledges the Army's real-world experience and expert judgment, presented in its permit application, that the realistic airborne release of lead will, in fact, be less than 100 percent due to considerable measures the Permittee will implement to mitigate blast effects. However, considering technical uncertainty regarding a quantifiable reduction of the lead release produced by mitigation measures, the EPA has chosen a conservative Emission Factor to ensure that the prior notifications are maximally protective of the public.

With respect to dust deposition, the Permittee's modeling must identify an "Advisory Area" associated with two lead concentration contours—one for deposition $\geq 5$ µg/ft$^2$ and another for $\geq 100$ µg/ft$^2$. These concentrations are based on the EPA's Dust-Lead Action Levels (DLALs) promulgated pursuant to the Toxic Substances Control Act. *See* "Reconsideration of the Dust-Lead Hazard Standards and Dust Lead Post-Abatement Clearance Levels," 89 Fed. Reg. 89416 (Nov. 12, 2024). The Permittee's public notifications must communicate specific advisory messaging to aid and encourage people within



Appellate Case: 26-3374 Page: 5 Date Filed: 11/22/2026 Entry ID: 5708599

modeled depositional areas to take actions that will prevent or mitigate their potential exposure to lead dust.

The Permittee's notifications must also identify an "Informational Area" associated with predicted airborne lead migration. The purpose of this notification is to notify the public that detectable concentrations of lead may pass through an area for a relatively short duration after the detonation takes place. The modeled extent of this "Informational Area" will be 0.18 µg/m3, which is the 1-hour equivalent of the EPA's published Method Detection Limit for lead. *See* Attachment 4; *see also* 40 C.F.R. Part 50, Appendix G, "Reference Method for the Determination of Lead in Total Suspended Particulate Matter." In practical terms, this concentration as modeled will represent the furthest distance at which air monitoring equipment could theoretically detect lead in ambient air. For this area, the Permittee's notifications must inform the public of lead's potential presence in ambient air after the detonation.

*Meteorological Restrictions*

The Emergency Permit's second measure to optimize protectiveness is the identification of meteorological conditions during which the treatment activity is not to occur. Weather conditions not only affect the operational safety of the treatment activity but also the anticipated environmental and human health effects that may result. Most significantly, both Army and EPA air dispersion modeling indicates that wind speed and direction will have a direct influence on the path and scale of the expected depositional and airborne impact areas.

To minimize the magnitude of human health risk, the Emergency Permit requires the Army to exercise reasonable best efforts to avoid conducting the treatment activity if dust-lead deposition is predicted to impact high-population-density areas to the east of the facility. These areas are defined by U.S. Census Tracts that are individually correlated with population density data that is comparatively higher than surrounding census tracts in Iowa and Illinois. Critically, census tracts provide a bright-line boundary against which the Permittee can readily compare depositional modeling footprints, enabling swift operational decision-making. Additionally, for the purpose of permit compliance, the EPA can use this data to objectively validate the Permittee's conduct of the treatment activity.

This directional constraint incorporates a geographic limitation to preserve sufficient operational flexibility for the Permittee. Census Tract 7 of Des Moines County, Iowa, is omitted from the list of designated census tracts to which depositional impact should be avoided. Exclusion of Census Tract 7 narrows the geographic scope of the directional prohibition, in effect widening the Permittee's zone of opportunity to conduct the detonation if all other criteria are met. Although Census Tract 7 is adjacent to others that are included within the directional exclusion zone, it is less densely populated (438.9 persons per square mile) due to a large proportion of undeveloped land and the Southeast Iowa Regional Airport in the western and central portions of the census tract. Notably, the most developed portion of Census Tract 7 is situated directly east of Census Tract 8; consequently, the EPA believes the Permittee's conscious avoidance of depositional impact to Census Tract 8 would guard against impact to the most populated portion of Census Tract 7.

Tailoring the directional constraint as described above is, in fact, an effort to optimize the Emergency Permit's protectiveness by ensuring that the detonation can occur under controlled conditions. If the

EPA's directional constraint is too broadly drawn then it could conceivably preclude target detonation dates that otherwise satisfy the Emergency Permit's meteorological criteria. Balancing the avoidance of impact to populated areas with the significant downside risk of uncontrolled detonation—a risk that is increasing with the approach of freezing winter conditions—is a key consideration in the design of this special condition of the Emergency Permit.

*Short-Term Dust Remediation*

As noted above, the treatment activity is expected to result in a considerable area of dust-lead deposition. To mitigate human exposure, the Emergency Permit requires the Permittee to conduct both soil sampling and wipe sampling of high-touch structural surfaces at all parks, public facilities, and private properties to which the Permittee has been granted Rights of Entry within the area of modeled dust-lead deposition $\geq 100\ \mu g/ft^2$ of the post-detonation plume impact estimate. This sampling activity must be initiated within 24 hours of the treatment activity to identify properties that warrant short-term cleanup. The Permittee is obligated to transmit the validated sampling data to the EPA within five days of receipt, and concurrently with that transmittal, the Permittee must submit a proposed work plan and schedule to implement the dust remediation activity for affected properties.

**Recommendation**

Region 7 has shared a draft of this permit with OGC/SWERLO, OLEM/ORCR, and FFEO for review. The attached Emergency Permit incorporates feedback received through comments from these offices. LCRD and ORC jointly request your signature on the Emergency Permit.

Attachments
1. Emergency Permit for Storage and Treatment (Nov. 13, 2026)
2. Administrative Record Index (Nov. 13, 2026)
3. Exposure Pathways Addressed by Emergency Permit Conditions
4. Air and Radiation Division Air Dispersion Technical Memorandum (Nov. 13, 2026)



Appellate Case: 26-3374 Page: 7 Date Filed: 11/22/2026 Entry ID: 5708599