# EXHIBIT 4

DEPARTMENT OF THE ARMY
OFFICE OF THE ASSISTANT SECRETARY OF THE ARMY
INSTALLATIONS, ENERGY AND ENVIRONMENT
[redacted]

September 4, 2026

[redacted]
U.S. Environmental Protection Agency, Region 7
Corrective Action Branch
[redacted]

Dear [redacted]:

This letter responds to correspondence from the Region 7 Administrator related to the emergency permit application at Iowa Army Ammunition Plant (IAAAP) dated August 31, 2026.

As previously stated, the Army carefully considered the full range of potential alternatives for the treatment of the lead azide in storage at IAAAP. In January 2026, the Army activated an operational planning team (OPT) to explore potential treatment alternatives. The OPT was tasked to develop an actionable plan that considered the acute explosive hazard associated with this material and that could be executed in a manner that ensured the safety of Army personnel and the surrounding community. An initial assessment revealed complexities that required the involvement of additional subject matter experts from across the U.S. Department of War, including the Department of War Explosives Safety Office (DWESO). Personnel from other federal agencies were also engaged, including the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and U.S. Environmental Protection Agency Region 7; representatives from both agencies regularly participated in OPT meetings throughout the process.

From January through April 2026, this multi-agency working group spent many hours conducting extensive literature searches, technical evaluations, and risk analyses of the full range of potential treatment alternatives. The OPT also performed blast effect analysis, explosives safety quantity distance calculations using advanced modeling and simulation, atmospheric plume modeling, and testing of specialized protective engineering controls. During the development and evaluation of potential alternatives, safety was identified as the single threshold criterion: a fundamental standard and mandatory requirement that must be satisfied for a potential alternative to be considered for selection and implementation.

The following broad categories of alternatives were considered: (1) in-situ chemical treatment; (2) closed-chamber thermal treatment; (3) relocation of individual drums for

treatment by open detonation; and (4) intentional detonation inside the earth covered magazines.

The OPT evaluated a wide range of potential reagents for in-situ treatment. This evaluation included the proprietary reagent MuniRem®, as well as sodium hydroxide, potassium bichromate, sodium nitrite, glacial acetic acid, and ceric ammonium nitrate. All methods of in-situ chemical treatment, regardless of reagent, require the drums to be opened to initiate the treatment. Potential migration of lead azide crystals into the lid rings and closure gaskets present an acute risk of unintentional detonation if an attempt is made to open the drums. Opening the drums requires the application of rotational torque that can create localized friction and shear forces that exceed the ignition threshold of the lead azide. Furthermore, chemical treatment requires physical mixing to achieve direct reagent-to-compound contact. Inserting mechanical impellers, chemical sparge wands, ultrasonic agitation devices, or other tools into the drums can introduce pinch points, cutting friction, and shear forces, resulting in risk of uncontrolled detonation. As a result of these considerations, explosives safety experts from the Army, DWESO, and ATF universally agreed that all alternatives involving in-situ chemical treatment failed to meet the threshold criterion.

On- and off-site closed-chamber thermal treatment, in both an armored, fuel-fired deactivation furnace and a rotary kiln incinerator, and relocation of individual drums for treatment by open detonation were also evaluated. These methods of treatment require manipulation and relocation of the drums, either by Army personnel or remotely operated equipment. Physical lifting, tilting, rigging, or reorienting of the drums using conventional forklifts or remote robotic systems generates internal movement, shifts the drum contents, and introduces drop risk, all of which could spark rapid auto-ignition resulting in unintentional detonation. Transporting the drums over interior floors, loading aprons, conveyor rollers, or roadways exposes the contents to continuous vibrational harmonics, transit shocks, and mechanical jolts. Under these conditions, an initiation in a single drum would propagate instantly across adjacent containers, resulting in an uncontrolled detonation. Based on these considerations, explosives safety experts from the Army, DWESO, and ATF universally agreed that all alternatives requiring manipulation or relocation of the drums do not meet the threshold criterion.

Following a series of briefings to increasingly higher leadership within the Army, the Secretary of the Army selected in-place, controlled, intentional detonation for treatment of the lead azide on May 8, 2026. This decision is supported by the technical consensus across military and federal explosive safety authorities that this is the only safe method of treatment. I have included correspondence from the ATF that provides further documentation that support the Secretary’s decision.

My point of contact for this action is Mr. Bryan M. Frey, Director for Operational Environmental Management, [redacted].

Sincerely,

Amy L. Borman
Deputy Assistant Secretary of the Army
Environment, Safety and Occupational
Health

Enclosure

**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Office of Field Operations*

*National Center for Explosives Training and Research*
*Redstone Arsenal, AL 35898*

Dr Theresa Smith
United States Army
Deputy Assistant Secretary of the Army – Sustainment
[redacted]

Dr Smith,

In regard to your request received via electronic mail on Friday, August 21, 2026, please find the below response. ATF and the National Center for Explosives Training and Research (NCETR) were asked to review the lead azide issue at the Iowa Army Ammunition Plant by the Secretary of the Army. From the outset, our role has been to review the available information and provide an unbiased, objective recommendation to Assistant Secretary Ingraham.

Over the past six months, ATF has reviewed studies and documents, participated in stakeholder meetings, and engaged in multiple subgroup discussions. Throughout this process, our position has remained consistent: the best and safest course of action is a controlled detonation of the material in place.

This determination is grounded in science. The training programs ATF provides for public safety bomb technicians and military explosives ordinance personnel (EOD) are rooted in established scientific principles, much of which are derived from Army organizations, including Picatinny Arsenal.

Specifically, Picatinny Arsenal's *Encyclopedia of Explosives and Related Materials* states that "explosives of the initiating type, such as lead azide, cannot be burned; hence relatively large quantities are destroyed by detonating them." A quantity of approximately [redacted] of lead azide clearly qualifies as large, and based on longstanding research, ~~it~~ should be destroyed by detonation.

ATF's Advanced Explosives Disposal Techniques Course relies heavily on validated Army research to ensure that disposal methods we teach are scientifically sound and that both public safety bomb technicians and military EOD personnel can operate safely. As the executive over ATF's NCETR, it is my duty to ensure that our recommendations remain firmly grounded in science.

The current situation presents significant risk factors:

- 68 barrels of lead azide [redacted]

- Material manufactured as early as the [redacted]
- Approximately [redacted] of uncertain storage history
- Storage since [redacted] in [redacted] magazines
- Unknown environmental conditions affecting stability and sensitivity

According to a report from a Devcom Bench Test from the Spring of 2026, the problem is clearly defined: "IAAAP faces increasing safety and operational risks due to deteriorating lead azide stockpiles. Approximately [redacted] are stored in drums containing wetted material. Over time, limited solubility has allowed lead azide to dissolve and recrystallize, leading to the formation of unstable crystalline structures, including buoyant crystals observed in recent inspections."

Given the age, storage conditions, and observed degradation of this material, the risk profile is both significant and uncertain. The decision to conduct a controlled detonation in place is supported by robust, objective scientific evidence, and prioritizes the safety of personnel and facilities. After thorough evaluation, it is ATF's position there are no other viable alternatives.

Should you have any additional questions, please feel free to contact me at [redacted].

Sincerely,

BRICE MCCRACKEN Digitally signed by BRICE MCCRACKEN Date: 2026.08.25 14:07:28 -05'00'

Brice P. McCracken
Special Agent in Charge