# United States Court of Appeals
## For the Eighth Circuit

---

No. 26-3374

---

Iowa Environmental Council; Sierra Club

*Petitioners*

v.

United States Environmental Protection Agency; Lee M. Zeldin, in his official capacity as Administrator, U.S. Environmental Protection Agency; Jim Macy, in his official capacity as Regional Administrator, Region 7, U.S. Environmental Protection Agency

*Respondents*

---

Petition for Review of an Order of the
Environmental Protection Administration

---

Submitted: November 19, 2026
Filed: November 23, 2026
[Published]

---

Before SHEPHERD, GRASZ, and JUSTIN D. SMITH, Circuit Judges.

---

PER CURIAM.

The Iowa Environmental Council and the Sierra Club (collectively, Petitioners) filed a petition for review challenging the issuance of an Emergency Hazardous Waste Management Facility Permit (the Permit) by the Environmental

Protection Agency (EPA) to the United States Department of the Army (the Army), authorizing the Army to detonate 68 drums of lead azide at the Iowa Army Ammunition Plant in Middletown, Iowa. Before us now is Petitioners' emergency motion for stay pending disposition of the petition for review. Concluding that Petitioners have failed to show that they are likely to prevail on their petition for review, we deny the emergency motion for stay and lift the administrative stay.

I.

In March 2026, the Army determined that 68 drums of lead azide, an explosive compound used as a detonating agent for other explosives, stored at the Army's Middletown ammunition plant, had deteriorated and become unstable. The lead azide had been stored in drums inside two earth-covered magazines for over two decades, with each drum filled with lead azide and a stabilizing storage solution comprised of water and ethanol. The Army discovered that changes to the storage solution had allowed the lead azide to recrystallize, rendering the explosive material unstable due to its increased sensitivity to shock and friction. While operating under emergency hazardous waste storage authorizations, over the next nine months, the Army worked to develop a permanent disposal method. On November 13, 2026, the EPA approved an emergency permit that authorized continued storage of the lead azide, but, for the first time, authorized the intentional detonation of the lead azide in place in the earth-covered magazines. The Permit took effect on November 13, 2026, and expires on February 11, 2027.

On November 15, 2026, the Army publicly announced that it planned two controlled detonations for November 20, 2026, at 12:00 p.m. Central Standard Time to dispose of the deteriorated lead azide. The Army issued a Public Advisory detailing its plans for the controlled detonation, which stated that "[i]n-place detonation by Explosive Ordinance Disposal experts is the safest way to eliminate the explosive safety hazard. The degraded lead azide has been deemed unsafe for relocation." The Public Advisory went on to explain that "[t]he detonation will result in an air plume with some lead-containing particles which will disperse in the

air and deposit on the ground. Lead is toxic to humans and animals." The Advisory continued that "[t]here are two primary pathways of concern" consisting of "[l]ead exposure by breathing in air after the detonation" and "[l]ead exposure from dust on surfaces." The Advisory provided recommendations for the public to "minimize potential exposure," which included: "[c]onsider avoiding the affected area," "[k]eep windows and doors closed," and "[a]fter the US Army determines the air exposure period has ended, consider cleaning indoor and outdoor surfaces such as play surfaces for children and windowsills." The Advisory also included two maps detailing the areas subject to airborne exposure to lead dust through respiration and exposure from lead dust on surfaces, noting that the maps were current as of the date of the Advisory and explaining that it would be updated prior to the detonation based on changes in the weather forecast. The Advisory cautioned that "[a]ll humans, but especially children, pregnant individuals, older adults, and other sensitive populations should avoid outdoor activities within affected areas." Finally, the Advisory also cautioned that "[r]esidents in Middletown will hear a loud noise; feel vibrations from two consecutive, rapid detonations; and will see a plume of dust. Due to the potential for localized window damage, the U.S. Army recommends that residents in the Middletown City Park neighborhood temporarily vacate the area during the detonations out of an abundance of caution."

On November 16, 2026, after the Army issued its Public Advisory, the EPA published notice of the Permit issued on November 13, 2026. On November 18, 2026, the Army issued updated projection maps, and, on November 19, 2026, the Army announced it was delaying its controlled detonation of the lead azide from Friday, November 20, 2026, at noon, to Monday, November 23, 2026. Also on November 19, 2026, Petitioners filed a petition for review, challenging the EPA's decision to issue the Permit. They also filed this emergency motion for stay, arguing that the Permit allows the Army "to detonate hazardous lead azide in the open, thus creating a plume of lead dust that will blanket homes and communities, possibly as far away as 100 miles or more," and that "[t]he Army intends to do so with less than a week's notice to the full public of the scope and potential impact of the planned detonation." On November 20, 2026, this Court issued an administrative stay of the

Permit "until the emergency motion for stay is ruled upon by this Court." On November 21, 2026, the EPA filed a Notice of the Army's Intent to Respond to Immediate Threat Under RCRA's Emergency Exclusion, stating that the Army "intends to invoke the emergency ammunitions and explosives exclusion to the EPA's regulatory and permitting Resource Conservation and Recovery Act ("RCRA") requirements, under which the Army may perform treatment by controlled detonation of the lead azide waste without the Emergency Permit that is challenged in this petition." The Notice detailed the immediate risk of an uncontrolled explosion based on dropping temperatures, stating that as temperatures in the area were expected to drop below 30 degrees Fahrenheit the risk of explosion increased. The Notice explained that the relevant regulations provide an exemption from both substantive standards and permitting requirements where there is "[a]n immediate threat to human health, public safety, property, or the environment, from the known or suspected presence of military munitions, other explosive material, or an explosive device, as determined by an explosive or munitions emergency response specialist" citing 40 C.F.R. § 264.1(g)(8)(i)(D) and 40 C.F.R. § 270.1(c)(3)(i)(D). Further, the Notice explained that an explosive or munitions emergency specialist has made the requisite determination, and, accordingly, the "regulations allow the Army to conduct a controlled detonation of the lead azide at the Facility even if the Emergency Permit that is at issue in this case is not in effect." The Notice further states that "the Army intends to Act on November 24, 2026."[1]

## II.

Petitioners assert that they are entitled to an emergency stay pending disposition of their petition for review, arguing they are likely to prevail on the merits of their claim that the EPA's permitting decision was arbitrary and capricious. A

---

[1]The emergency motion for stay seeks only to stay the EPA's permitting decision pending resolution of the petition for review. The Army is not a defendant in this action. We thus cannot and do not opine on the Army's stated intended course of conduct as described in the notice filed by the EPA on November 21, 2026, as it is not before this Court.

request for an emergency stay pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 705, is evaluated under the same standard that this Court uses to evaluate a request for a preliminary injunction. See State v. U.S. Env't Prot. Agency, 989 F.3d 874, 883 (10th Cir. 2021) (applying the factors for considering whether to issue a preliminary injunction to question of whether a court should grant a stay of an agency action under § 705 of the APA). The four factors we consider in determining whether a stay is appropriate are: "(1) whether there is a substantial probability movant will succeed at trial; (2) whether the moving party will suffer irreparable injury absent the injunction; (3) the harm to other interested parties if the relief is granted; and (4) the effect on the public interest." Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 112 (8th Cir. 1981) (en banc). "While no single [Dataphase] factor is determinative, the probability of success factor is the most significant." Schmitt v. Rebertus, 148 F.4th 958, 966 (8th Cir. 2025) (alteration in original) (citation omitted). Further, the third and fourth factors "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).

We first consider the likelihood of success on the merits. Petitioners assert that the Permit is unlawful on both substantive and procedural grounds. Under the APA, reviewing courts shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Arbitrary and capricious review, at its core, measures if an agency action was irrational." Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior, 95 F.4th 573, 579 (8th Cir. 2024). An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). An agency acts arbitrarily and capriciously when it:

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.



Appellate Case: 26-3374 Page: 5 Date Filed: 11/23/2026 Entry ID: 5708974

Id. Petitioners contend that the Permit is arbitrary and capricious because it (1) fails to comply with applicable environmental performance standards, (2) omits necessary protective conditions, and (3) fails to adequately consider alternative treatment methods. Specifically, Petitioners contend that the EPA violated environmental performance standards by authorizing open detonation without adequately evaluating the foreseeable dispersal of toxic lead dust into surrounding communities, farmland, and waterways. They further assert that the Permit lacks additional protective conditions necessary to address these risks, particularly regarding public notification, environmental monitoring, cleanup, and vulnerable populations. Finally, Petitioners argue that the EPA accepted the Army's rejection of alternative treatment methods without sufficient scrutiny, particularly regarding chemical neutralization and mobile treatment technologies.

In response to Petitioners' contentions, the EPA maintains that the Army's munitions experts evaluated alternative treatment methods, including chemical neutralization, thermal treatment, and relocation of the drums but ultimately determined that controlled detonation was the only safe option because disturbing the unstable lead azide posed an unacceptable risk of an uncontrolled explosion. The EPA further argues that the Permit contains sufficient protective conditions, including advance public notification, containment barriers, weather restrictions, environmental monitoring, soil and surface sampling, and cleanup requirements, to minimize the resulting environmental risks.

These substantive challenges arise under the RCRA and its implementing regulations governing hazardous-waste treatment and emergency permits. Open detonation of hazardous waste is generally regulated under Subpart X of 40 C.F.R. Part 264, which governs miscellaneous hazardous-waste treatment units. 40 C.F.R. § 264.600. Under § 264.601, permits for such units authorizing hazardous-waste treatment must "contain such terms and provisions as necessary to protect human health and the environment." The regulation requires consideration of potential

releases of hazardous constituents into the air, soil, groundwater, and surface water. Id.

In addition to the environmental performance standards under § 264.601, 40 C.F.R. § 270.32 requires that hazardous-waste permits must include "conditions necessary to achieve compliance" with applicable statutory and regulatory requirements. Under 40 C.F.R. § 265.382, open burning of hazardous waste is generally prohibited, "except for the open burning and detonation of waste explosives" that "cannot safely be disposed of through other modes of treatment." Although the EPA may issue emergency permits, those permits must incorporate applicable requirements under Part 264 "to the extent possible and not inconsistent with the emergency situation." 40 C.F.R. § 270.61(b)(6).

Upon review of the Permit's special conditions for treatment of lead azide, listed in Section IV, we conclude that the EPA adequately incorporated safeguards to minimize the dispersal of lead dust into the environment and mitigate the risks associated with potential exposure pathways. The Permit includes many conditions designed to address the concerns of Petitioners. Specifically, it requires containment barriers and weather restrictions designed to limit lead dust dispersal. It also requires advance public notification and updated air dispersion modeling, environmental monitoring, and sampling of soil and high-contact surfaces within the affected areas. Further, the Army must begin specified sampling within 24 hours of detonation and submit a proposed work plan and schedule for necessary remediation. Although Petitioners contend that additional protections are necessary, these conditions demonstrate that the EPA considered the potential environmental consequences and imposed measures to address them. See Badger Helicopters Inc. v. Fed. Aviation Admin., 154 F.4th 902, 915 (8th Cir. 2025). Accordingly, Petitioners have failed to show they are likely to establish that the EPA acted arbitrarily or capriciously in determining that the Permit conditions adequately protect human health and the environment.

We also conclude Petitioners have failed to show they are likely to succeed on their challenge to the EPA's consideration of alternative treatment methods. The



Appellate Case: 26-3374 Page: 7 Date Filed: 11/23/2026 Entry ID: 5708974

record reflects that the Army evaluated "a full range" of alternatives, including on site chemical treatment, closed chamber thermal treatment, relocation of the individual drums of lead azide, and intentional detonation inside the earth covered magazines. The Army ultimately concluded that "in-place, controlled, intentional detonation for treatment of the lead azide" was the best course of action. The EPA considered that assessment and relied on the Army's explosives experts, who determined that disturbing the deteriorating lead azide would create an unacceptable risk of an uncontrolled explosion. See id. While Petitioners disagree with that determination, the record does not provide a sufficient basis to conclude that the EPA failed to meaningfully consider safer alternatives or that its reliance on the Army's technical assessment was unreasonable. Therefore, Petitioners have failed to show they are likely to establish that the EPA's consideration of alternative treatment methods was arbitrary or capricious. Accordingly, we conclude Petitioners have failed to show they are likely to prevail on their substantive challenges to the Permit.

With regard to their procedural challenge, Petitioners argue that the EPA violated mandatory procedural requirements by failing to provide adequate public notice and an opportunity for comment before issuing the Permit. The APA requires reviewing courts to set aside agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Under 40 C.F.R. § 270.61(b)(5), emergency permits must be accompanied by public notice under § 124.10(b), which requires "at least 45 days for public comment" for RCRA permits. Although § 270.61(a) authorizes the EPA to issue emergency permits notwithstanding ordinary permitting procedures, subsection (b)(5) expressly incorporates the public-notice requirements of § 124.10(b). Petitioners contend that these provisions require the EPA to provide a public-comment period before issuing the Permit. The EPA maintains that emergency permits require only limited public notice.

Although § 270.61(b)(5) expressly references § 124.10(b), requiring a full 45-day comment period before issuing an emergency permit would be inconsistent with the regulations governing the emergency permitting process. See Cody v. Hillard,

304 F.3d 767, 776 (8th Cir. 2002) ("Statutes are to be interpreted as a whole . . . . In particular, courts should not interpret one provision 'in a manner that renders other sections of the same statute inconsistent, meaningless, or superfluous.'" (citation omitted)); see also Northshore Mining Co. v. Sec'y of Lab., 709 F.3d 706, 710 (8th Cir. 2013) (interpreting regulatory provisions with statutory interpretation rules). Moreover, § 270.61(b)(6) requires emergency permits to incorporate applicable substantive requirements "to the extent possible and not inconsistent with the emergency situation." While this provision does not expressly govern public notice, it reflects the regulation's recognition that emergency circumstances may require flexibility. Reading § 270.61 as a whole, we conclude that the 45-day notice and comment period is not a prerequisite to issuing an emergency permit where it would be "inconsistent with the emergency situation." 40 C.F.R. § 270.61(b)(6). The lack of any such notice and comment period for the Permit is not fatal to its issuance.[2] Petitioners have thus failed to show they are likely to succeed on their procedural challenge. We therefore conclude that Petitioners have not shown that they are likely to prevail on the merits of their petition for review.

We now turn to the factors of irreparable harm, the harm to other interested parties if the relief is granted, and the effect on the public interest. As an initial matter, "[a] stay is not a matter of right, even if irreparable injury might otherwise result." Nken, 556 U.S. at 433 (citation omitted). We acknowledge, and the parties agree, that the controlled detonation of the lead azide barrels will result in harm to the public through environmental and health risks. However, that alone does not

---

[2]We note, but do not decide, that the APA's military function exception may impact whether any notice and comment period is required here. While other courts have held "[u]nder the Administrative Procedures Act, the EPA must provide the public with notice and an opportunity to comment before it issues [RCRA] permits," Nat. Res. Def. Council v. EPA, 279 F.3d 1180, 1186 (9th Cir. 2002) (citing 5 U.S.C. § 553(b)-(c)), the APA does not impose notice and comment requirements when "there is involved . . . a military or foreign affairs function of the United States." 5 U.S.C. § 553(a)(1); see also United States v. Ventura-Melendez, 321 F.3d 230, 232 (1st Cir. 2003) (exempting military functions from notice and comment requirements).



Appellate Case: 26-3374 Page: 9 Date Filed: 11/23/2026 Entry ID: 5708974

entitle petitioners to a stay. As the EPA points out, evaluation of the threat of irreparable harm must take into consideration the realities of the situation; here, we consider the threat of irreparable harm from a planned, controlled detonation in contrast to the threat of irreparable harm from an uncontrolled explosion. Petitioners assert that where an environmental injury is sufficiently likely, "the balance of harms will usually favor the issuance of an injunction to protect the environment" because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545 (1987).

Again, however, here we are faced with a situation in which the risk is between a controlled detonation and an unplanned explosion, not between the risk of a controlled detonation and no explosion at all. As the record reflects, the lead azide has deteriorated to the extent that it is extremely sensitive to friction and thus cannot be moved. Further, dropping temperatures increase the risk of an uncontrolled explosion because the crystallized substance can more easily break free in freezing temperatures, which can result in a chain reaction of uncontrolled explosions of the barrels containing lead azide. As the record further reflects, controlled detonation of the lead azide allows significant mitigation protocols: allowing the Army to conduct the detonations during favorable weather conditions to limit the scale and control the path of the dispersal of airborne lead particles, providing advance notifications to the public and surrounding communities, and allowing the Army to immediately begin its environmental response. In this context, a controlled detonation with attendant safety measures better alleviates the risk of irreparable harm than the risk of an uncontrolled explosion. As to the final factors of harm to other interested parties and the effect on public interest, which merge where, as here, the Government is the opposing party, see Nken, 556 U.S. at 435, they too weigh in favor of a controlled detonation with enacted safety measures over an uncontrolled explosion with potential unknown consequences.

We are mindful of the very real risks presented by the Army's planned detonation of the stores of degraded lead azide. However, we must acknowledge the



Appellate Case: 26-3374 Page: 10 Date Filed: 11/23/2026 Entry ID: 5708974

realities of the situation: the degraded explosives present a risk of an uncontrolled and unplanned explosion, which would occur without the benefit of the safety measures that the Permit puts in place. Considering the permitting decision in its proper context—made in response to an already existing emergency situation—we cannot conclude that Petitioners have shown that they are likely to prevail on the merits of their petition for review or that the other Dataphase factors mandate issuance of an emergency stay.

III.

We grant Petitioners' motion to file an overlength emergency motion for stay and their motion for leave to file additional declarations in support of the emergency motion for stay. We deny the emergency motion for stay pending disposition of the petition for review, and we lift the administrative stay.

______________________________